UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN CARROLL,

     Plaintiff,

v.

CMS ENERGY CORPORATION,
STACI NOWAK, and
CONSUMERS ENERGY COMPANY,

     Defendants.

Case No. 21-11238
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [40]**

---

For just over a year and a half, Steven Carroll worked for Consumers Energy as a team leader for the Southeast region, which included metro Detroit. Consumers is a public utility that provides electricity and natural gas to its customers, and Carroll oversaw a team in charge of restoring properties after utility work had been performed, as well as other administrative duties.

According to Consumers and Carroll's supervisor, Staci Nowak, Carroll's performance never grew to meet the company's expectations. So after numerous coachings, a documented counseling, a "needs improvement" rating on his performance evaluation, an incomplete performance correction plan, and three different instances of poor feedback from his direct reports, Consumers decided to terminate Carroll in August 2020.

Carroll has a different view of things. In May 2019, Carroll says he told Nowak's supervisor that he agreed with another employee's complaint that Nowak spoke more harshly to African American employees (including himself) than other employees. Carroll believes things went downhill from there, with Nowak overly scrutinizing and criticizing his performance from that point on. According to Carroll, Nowak never gave him the benefit of the doubt and never extended the same consideration and support to him as she did to his white counterparts. And in the spring of 2020, he started taking intermittent leave under the Family Medical Leave Act for his anxiety, depression, and PTSD, which made matters worse.

Carroll believes it was these factors—his race, disability, and FMLA leave status—that led to Nowak critiquing his performance and, ultimately, terminating him. So he sued Consumers and Nowak for a host of claims under 42 U.S.C. § 1981, Title VII, the Michigan Elliot-Larsen Civil Rights Act, the Americans with Disabilities Act, the Michigan Persons with Disabilities Civil Rights Act, and the Family Medical Leave Act.

In time, Consumers moved for summary judgment on all claims. (ECF No. 40.) For the following reasons, the Court grants the motion.

## I.

## A.

As Consumers seeks summary judgment, the Court accepts as true Carroll's version of the events. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2

In January 2019, Steven Carroll started at Consumers as a Business Support Consultant (sometimes referred to as a "team leader"). (ECF No. 44-2, PageID.1425, 1447; ECF No. 44-3, PageID.1673.) Carroll described the role as being "an administrative assistant and property restoration coordinator to oversee the property restoration department" and other departmental functions. (ECF No. 44-2, PageID.1449.) Property restoration refers to restoring a customer's property after Consumers "disrupts" it to work on its electric or gas operations. (ECF No. 44-3, PageID.1647.) It includes concrete and asphalt repair as well as landscaping. (*Id.*) The property restoration group works with contractors to complete the restoration work, and the peak season is March through October. (*Id.* at PageID.1646–1647.) Carroll was responsible for the Metro Southeast region. (ECF No. 44-3, PageID.1661.)

Carroll joined a cohort of two other team leaders—Akausha Richardson, who covered the East region, and Debra Hines, who covered the West. (ECF No. 44-3, PageID.1644, 1651, 1657, 1658.) Soon, Hines was terminated and, in the fall of 2019, Steven Rodriguez was hired in her place. (*Id.* at PageID.1657–1658.) The three team leaders—now Richardson, Carroll, and Rodriguez—reported to Staci Nowak, who in turn reported to Richard Woolford. (ECF No. 44-3, PageID.1644, 1648.) Woolford reported to Doug Detterman. (ECF No. 44-4, PageID.1810.)

### 1. Carroll's Problems Getting Started

Carroll identifies a few issues from the start of his employment that were out of his control. The lack of training was one of them.

Nowak held an orientation for Carroll. (ECF No. 44-2, PageID.1434.) Carroll stated it was one or two days, and "[o]ne-on-one hands-on," with "another five to seven days of just knowing how to reach out to [Nowak] and giving me the feedback that I needed. She was on stand-by for me for any additional information for five to seven days." (ECF No. 40-2, PageID.460.) According to Carroll, this was a minimal amount of training, and the focus was learning on-the-job. (*Id.* at PageID.482.) Nowak agreed there was no "formal training program" and that she encouraged new hires to use "job shadowing, one-on-ones, [and] weekly one-on-ones to run through processes[.]" (ECF No. 40-3, PageID.693.)

Despite the minimal formal training, Carroll conceded that he interacted with Nowak "[p]retty much every day[,]" either one-on-one or in a group setting. (ECF No. 40-2, PageID.466.) And Carroll and Nowak had one-on-one meetings weekly. (ECF No. 44-2, PageID.1496 ("[P]rior to the guidance counseling, I met with [Nowak] weekly, not in person, but we spoke weekly one-on-one[.]"); ECF No. 44-3, PageID.1667 (Nowak describing weekly one-on-ones with Carroll as part of his training).)

Carroll also had trouble gaining access to the correct company systems and other IT issues when he first started. He explained that Nowak "assigned me within my first week to request my own accesses to a company system that I was not familiar with. Based on her direction. I put those requests in. I got some type of access, but it wasn't the right access and I had no way or no one to help me get the correct access until it got figured out, which was months down the line. I was getting thousands of

4

[irrelevant] emails every single hour to the extent that I couldn't even look at the relevant emails because I was getting thousands of emails every hour. . . . [Nowak] and my direct reports were aware of this system glitch and these IT issues I was having, but . . . [s]he didn't do anything to help me correct it." (ECF No. 40-2, PageID.502.)

In addition to the IT problems, Carroll found his team to be difficult. Carroll inherited some preexisting performance and interpersonal problems from his predecessor. On top of those, Nowak told Carroll that a couple of his employees had applied for his position. (ECF No. 40-3, PageID.692.) Nowak confirmed that only two of Carroll's employees applied for the job, that she decided not to interview them, and that she explained to them why that was. (*Id.* at PageID.691.) But Carroll claimed that because of this dynamic, and because most of the training was shadowing employees, Nowak "saddled me with those individuals when I started the processes in the company systems[,]" though "she knew [they] had issues with me because they had applied for the position and I got it." (ECF No. 40-2, PageID.482.)

The record also shows that Carroll's team was inexperienced in property restoration going into the 2019 season, and that the Southeast region had the most property restoration work to be done. In 2019, Nowak noted that Carroll's region has "the largest number of [property restoration] orders and about 45% impact on the workload," which is a higher proportion than his other two colleagues, who would share 55% of the workload. (ECF No. 40-8, PageID.944.) Nowak also told Woolford in June 2019 that Carroll did not have a "full[y] trained team[.]" (ECF No. 44-11,

PageID.2177.) The imbalance in workload was apparently addressed, however, because by April 2020, Nowak explained to Carroll that though Rodriguez has more people handling property restoration, those same people have numerous other responsibilities too, so the amount of work per person was about the same. (*See* ECF No. 44-39, PageID.2271.) It also appears that as of 2020, the Southeast region had only 5 headquarters and only gas-related work, while the West region had 20 headquarters and both gas and electric work, and the East had 13 headquarters with both gas and electric work. (ECF No. 44-9, PageID.2167.)

## 2. Hines' termination

As mentioned, when Carroll first started at Consumers, he worked with Deborah Hines, who was the team leader for the West region. Nowak became Hines' supervisor in July 2018.

According to Hines and Carroll, all three team leaders—all of whom are African American—commiserated over Nowak's harsh treatment of them. (ECF No. 44-7, PageID.2156.) Hines recalls one instance where "Nowak was so mean to myself and the other African American business consultants that it brought [Richardson] to tears. I called Nowak to discuss her handling of the conversation . . . . [She] responded 'that's the way it is' now that she is managing." (*Id.*)

And come May 2019, these issues started to escalate. Hines said she complained to Consumers' HR Department and Detterman (Woolford's boss) about how Nowak spoke to herself and other African American employees. (ECF No. 44-7, PageID.2156.) She also complained to the compliance department that she was

6

improperly passed over for a transfer to another department. (*Id.*) After these complaints, Hines was placed on a performance correction plan. (*Id.*) In objecting to the plan, Hines wrote to Woolford that she "believed Nowak was setting [her] up to fail." (*Id.*)

Carroll testified that in addressing Hines' complaint, Woolford asked him if he agreed with Hines that Nowak spoke to African American employees in a harsher manner than other employees. (ECF No. 44-2, PageID.1557.) Carroll agreed. (*Id.*) According to Carroll, Woolford told him that he would "talk with [Nowak] about it" and "let her know that we had the conversation." (*Id.* at PageID.1558.) And though it is unclear exactly when, at some point after Carroll spoke to Woolford, Nowak told him he "should be careful when [he] was talking to [Woolford]." (ECF No. 44-2, PageID.1509.)

For her part, Nowak said she was not made aware of any complaint that she was accused of speaking differently to African American employees. (ECF No. 40-3, PageID.705.) Though she confirmed that she was aware of Hines' complaint, she was not aware it was related to Hines' race. (*Id.*) Woolford similarly stated that Hines did not bring discrimination concerns to him about Nowak and that they did not discuss race. And he said he asked Carroll questions about Nowak's communication style and leadership, but they did not discuss issues of race. (ECF No. 40-4, PageID.859–860, 865.)

7

On July 15, 2019, Hines was told her compliance complaint regarding her attempted transfer was unsubstantiated, and she was terminated on August 2, 2019. (ECF No. 44-7, PageID.2157.) Rodriguez was hired as her replacement.

### 3. Chronology of Performance Issues and Later Complaints

Back to Carroll. Just a month or so into Carroll's employment, Nowak noted some issues with his performance that she had to "coach" him on. For example, on February 27, Nowak noted that Carroll inappropriately gave another manager a directive when Carroll was supposed to complete the task himself. (ECF No. 40-6, PageID.932.) On March 13, Nowak stated that Carroll had not set up certain processes that were "supposed to be in place 1 month ago," and on March 29, she again reminded Carroll to set up job shadows as he had not done so. (*Id.*)

After Carroll's conversation with Woolford in May 2019, a few performance issues popped up again. On June 27, Nowak told Woolford that she is "worried" about Carroll because he had not yet met with HR about a lingering issue with one employee's performance. (ECF No. 44-11.) Per Nowak's notes, Carroll did not discuss this employee's performance issues with HR, and instead "told her she was no longer going to be doing" certain parts of the job. (ECF No. 40-6, PageID.933.) As a result, the employee "has expressed concerns that she is being treated differently due to her age" which Nowak stated "reinforc[es] that [Carroll] should have had support from HR prior to making any decisions." (*Id.*) To Woolford, Nowak wrote that Carroll said "he didn't have time [to meet with HR] and he's busy calling customers. But I'm currently calling customers that have not heard from anyone." (ECF No. 40-11.) She

8

went on to say that she thinks Carroll "has a good work ethic and he has the intelligence. I'm worried because the pace in his area is so fast and he's so new." (*Id.*) She also explained that, to address the issue, she will have Carroll "focus on the operation" as opposed to "process and CE Way," and then "[o]nce they get past Sept." she will have him refocus on those areas. (*Id.*) There were also a couple of issues with Carroll scheduling conflicting meetings and providing unresponsive replies to emails. (ECF No. 40-6, PageID.933.)

In September 2019, Carroll's team members began complaining about him too. Nowak noted that an employee "reached out to me and said the team wanted to meet with me to discuss concerns regarding the dept." (*Id.*) Carroll's team had attempted to set up a meeting with him first to provide feedback, but he stated he would not meet with them, and they could bring concerns to him one-on-one. (*Id.*) With Nowak's encouragement, Carroll held a meeting with the team at the end of September where his direct reports expressed issues with his failure to respond to their emails, confusing coaching with process discussions, and not understanding the business properly. (*Id.*)

By the end of October, Nowak indicated to Woolford that she intended to rate Carroll as "needs improvements" on his yearly performance evaluation. (ECF No. 40-4, PageID.884.) And a couple of days later, Nowak and Kurt Williamson, an HR representative, issued a "counseling" to Carroll. (ECF No. 40-7.) The issues documented in the counseling included being unfamiliar with other departments and how they integrated with his team, being unable to monitor his team's work because

he did not have access to the shared drive, being late to meetings and calls (though there had been improvement), using an inappropriate tone in communications that did not fit the recipient, and not ensuring that his team followed property-restoration processes. (*Id.*) Carroll stated that he "did not expect that this guided counseling would paint that negative picture of me that it did." (ECF No. 40-2, PageID.521.) A few weeks after receiving the counseling, Carroll apparently told Woolford he "felt like his job was in jeopardy" and that Nowak and Williamson "were coming from a position of moving him out of the company." (ECF No. 44-14, PageID.2180.)

Carroll eventually completed the objectives in his counseling. (ECF No. 44-3, PageID.1730.) But issues apparently remained with his work.

In January 2020, Nowak followed through with her earlier statement and rated Carroll as "needs improvement" on his performance evaluation. (ECF No. 44-16.) This rating prevented Carroll from receiving a raise. (ECF No. 44-2, PageID.1485.) Only a few months into the job, Rodriguez was rated as "fully effective." (ECF No. 44-36.)

In February, Nowak again received feedback from Carroll's team—this time, via a "skip-level meeting," where supervisors gather feedback from their subordinate's direct reports. These meetings are "recommended, especially where you do have leaders . . . that are having some difficulties or performance areas[.]" (ECF No. 44-5, PageID.2016.) The team reported low morale during these meetings. (ECF No. 40-9.) Some employees described Carroll as "abrasive," "not knowledgeable about things and when he gets asked questions he can't answer, he gets irritated[.]" (*Id.* at

10

PageID.957.) They said Carroll "[s]huts down when people ask for clarification" and "[c]omes across as condescending [and] . . . [n]ot approachable." (*Id.*) "Some days he seems receptive to feedback, other times he's not open to it and it's his way just do it." (*Id.*)

The performance issues summarized above culminated in a performance correction plan issued on March 23, 2020. The plan noted the following deficiencies: communicating ineffectively with his team; not ensuring his team follows company processes; not improving or meeting metrics in certain areas; and mixing up calendar invites and being late to meetings. (*See generally* ECF No. 44-18.)

Believing this to be unjustified, on April 13, Carroll emailed a Consumers' compliance investigator stating, "Nowak has been targeting me and making me feel incompetent since the day I was hired." (ECF No. 40-16, PageID.1114.) Carroll stated that "Nowak takes unwarranted disciplinary actions towards me amid the wake of the COVID-19 stay home orders that had been placed just one day prior. Still, with no concrete facts/feedback, [Nowak] placed me on a Performance Correctio[n] Plan." (*Id.*) He also mentioned that he has noticed "disparities" in the way he and Rodriguez have been treated, including different expectations, Rodriguez receiving a merit increase, and Rodriguez receiving a "meets expectations" rating on his 2019 performance review. (*Id.* at PageID.1115.)

The next day, compliance investigator David Corravo emailed Carroll back stating, "[w]hen a leader is appropriately holding an employee to performance expectations, it is not misconduct nor does it create a hostile work environment. Can

you provide us examples of the harassment or hostile work environment that you are experiencing?" (ECF No. 44-21, PageID.2224.) Carroll replied, "[t]his is not a 'cookie cutter' situation based around a team leader simply holding the associate accountable for performance expectations." (*Id.*) A few weeks later, Carroll followed up and told Corravo he believes Nowak is retaliating against him for his conversation with Woolford 11 months' prior in May 2019. (ECF No. 44-22.) He also provided examples of the alleged harassment, including Nowak attending meetings "only to antagonize and bully me into being more flexible with safety discussions & other corporate bulletins;" "Employee Engagement is lower than the company's average throughout [Nowak's] entire organization [so] [i]t is not fair that she is ostracizing my business unit for a gap that requires statewide attentions;" "coordinating side bar conversations about me with my direct reports and other business partners without any constructive intent;" and "interfering in day to day operations[.]" (ECF No. 40-17, PageID.1117–1122.)

Two weeks after Carroll submitted his complaint, Corravo emailed him stating "I understand that it is frustrating when you disagree with your leader regarding your performance, however leaders are responsible [for] managing their employees['] performance. In reviewing all your information you provided . . . we did not find there to be misconduct by your leader." (ECF No. 40-18, PageID.1124.)

Meanwhile, Carroll's performance plan continued. Starting in May, Carroll began recording certain meetings he had with Nowak and others, including the meetings regarding his performance plan. The details of these meetings are reviewed

more closely below. But notably, on June 10, Carroll tells Nowak that he does not "know if it is a racial thing" that she or Williamson (the HR rep) have with him. (Audio Ex. 4.)

Also in June, Nowak conducted a second round of skip-level meetings with Carroll's team. The feedback was more mixed, with six or so employees out of the 13 interviewed saying they have no issues with Carroll or that he is improving. (ECF No. 40-13.) Others still had complaints, however: "He isn't abusive per se, but he still snaps at people when he realizes he is wrong or doesn't understand what they are asking;" "Not really any difference;" "Seeing progress but [Carroll] is still not retaining everything he hears;" "[Carroll] is still mixing up who is responsible for what team or area;" "He is abusive and demeaning;" "[Carroll] is rude and disrespectful[.]" (ECF No. 40-13, PageID.1104–1106.)

On June 23, 2020, Nowak and Woolford were notified that Carroll was approved for intermittent FMLA leave. (ECF No. 44-26.) The approval did not state why. (*See id.*)

Apparently dissatisfied with the results of the April 13 complaint, Carroll made another harassment complaint on July 6. (ECF No. 44-27, PageID.2231.) Compliance investigator Sue Koseck formally investigated whether "Nowak is engaging in harassing behavior and racially discriminatory behavior directed toward" Carroll. (*See* ECF No. 44-9, PageID.2162.) As part of this investigation, Koseck interviewed Woolford, Carroll, Nowak, Williamson, and Rodriguez. (*See generally* ECF No. 44-9.) On July 28, Koseck emailed Woolford with an update on the

investigation and said that she is "putting . . . the finishing touches" on her report. She further stated she had "completed [her] interviews" and "[a]t this point, I have not found [Carroll's] treatment [to be] harassing or discriminatory." (ECF No. 44-29, PageID.2233.) But it appears that the "finishing touches" were slightly more substantive than indicated—Koseck interviewed Rodriguez the next day, on July 29. (ECF No. 44-9, PageID.2170.) And though she had interviewed Nowak on July 17, Nowak provided written responses on July 31. (ECF No. 44-30.) About a month after Carroll made the complaint, on August 5, Koseck sent a printed letter to Carroll stating that "the case has been closed as unsubstantiated. The investigation did not find actions by leadership rose to the level of harassment and/or discrimination." (ECF No. 44-31, PageID.2240.)

Also by August 5, plans were already in motion to terminate Carroll. That same day, Williamson emailed Woolford concerning "Carroll's termination on Friday[.]" (ECF No. 40-14, PageID.1108.) Consumers ultimately delayed Carroll's termination a bit more as he was "utilizing sick leave" (ECF No. 44-33), terminating him on August 12, 2020 (ECF No. 40-15).

## B.

That brought Carroll to this Court, where he sued CMS Energy Corporation, Consumers Energy Company, and Nowak for discriminating against him based on his race and disability and for taking leave under the Family Medical Leave Act. Specifically, Carroll's amended complaint brings the following claims: race discrimination under 42 U.S.C. § 1981, Title VII, and the Michigan Elliot-Larsen

Civil Rights Act (Counts I, IV, VII); hostile work environment under § 1981, Title VII, and the ELCRA (Counts II, V, VIII); retaliation under § 1981, Title VII, and the ELCRA (Counts III, VI, IX); disability discrimination under the Americans with Disabilities Act and the Michigan Persons With Disabilities Civil Rights Act (Counts X and XI); and a violation of the FMLA (Count XII). (ECF No. 23.)

Following discovery, Consumers brought a motion for summary judgment on all counts. (ECF No. 40.) That motion has been fully briefed. Given the clear briefing and record, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II.

Federal Rule of Civil Procedure 56 provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Or, stated less formally, Consumers is entitled to summary judgment only if no reasonable jury could find in favor of Carroll. *See Anderson*, 477 U.S. at 251–52.

## III.

### A. Race Discrimination

The Court begins by considering Carroll's race-discrimination claims. He brings those claims under three separate statutes: 42 U.S.C. § 1981, Title VII, and

the Michigan Elliott-Larsen Civil Rights Act. Courts analyze discrimination claims under § 1981 and Title VII using the same framework, and neither party has indicated material differences in the legal analysis pertaining to these claims. *See Smith v. City of Toledo, Ohio*, 13 F.4th 508, 514 (6th Cir. 2021) ("We analyze Smith's . . . § 1981 claim under the same framework we use for his Title VII claim."). So too with the ELCRA claim. *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001). So the Court will analyze all three race-discrimination claims together.

Carroll relies on indirect evidence of discrimination, so the familiar *McDonell-Douglas* burden-shifting framework applies. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023); *Hazle*, 628 N.W.2d at 521. Under this framework, Carroll must first establish a prima facie case of discrimination. *Levine*, 64 F. 4th at 797. Then, it is up to Consumers to produce evidence of a "legitimate, nondiscriminatory reason" for Carroll's termination. *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Hazle*, 628 N.W.2d at 521–22. If Consumers satisfies its burden, then the third step requires Carroll "to prove . . . the legitimate reasons offered by [Consumers] were not its true reasons, but were a pretext for discrimination." *Levine*, 64 F. 4th at 797; *see also Hazle*, 628 N.W.2d at 522.

16

### 1. Prima Facie and Nondiscriminatory Reason

Consumers challenges one prong[1] of Carroll's prima facie case—whether he can establish he was "qualified for his position." *See Levine*, 64 F.4th at 797 ("At this stage, the plaintiff must demonstrate that . . . [he] was qualified for [his] job[.]").

Considering the evidence of Carroll's performance issues discussed previously, a fair portrait of his performance would be one of a new employee who had the potential to lead his team to success but fell short in certain areas with little improvement over time despite feedback on his performance. But because Carroll challenges the accuracy or scope of some of these performance issues, and the prima facie burden "is not onerous," *Levine*, 64 F.4th at 797, the Court will assume without deciding that Carroll has met his prima facie burden and move on to the next step of the burden-shifting framework.

And as described above, Consumers has "clearly set forth, through the introduction of admissible evidence, the reasons for" Carroll's termination. *See Levine*, 64 F.4th at 797. So the Court goes on to analyze pretext.

---

[1] Consumers also challenges whether Carroll can show a "similarly situated" employee outside of Carroll's class was treated more favorably. *See Smith v. City of Toledo, Ohio*, 13 F.4th 508, 515 (6th Cir. 2021). At times, however, the Sixth Circuit has stated that a plaintiff's prima facie case requires evidence either that he "was replaced by a person outside the protected class" or "treated differently" than an employee of a different race. *Compare Levine*, 64 F.4th at 797 *with Smith*, 13 F.4th at 515 ("With respect to the prima facie case, Smith has not identified a comparator— that is, someone of a different race, who was similarly situated to him, but who was treated better."). And there is no dispute that Carroll was replaced by a person outside of his protected class. (ECF No. 44-24, PageID.2244.) So the Court will analyze this argument in the context of pretext. *See Smith*, 13 F.4th at 516 ("Sometimes, as our cases show, the same evidence is germane to each inquiry." (internal citations omitted)).

## 2. Pretext

Under both Title VII and the ELCRA, Carroll can establish pretext by showing that a similarly situated employee outside of his protected class was treated better than he was. *See Smith*, 13 F.4th at 515 (Title VII); *Hecht v. Nat'l Heritage Acads., Inc.*, 886 N.W.2d 135, 147 (Mich. 2016) (providing that under the ELCRA, "[a]n employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race, can give rise to an inference of unlawful discrimination").

Carroll focuses on one comparator—Rodriguez, who is not African American. (ECF No. 44-3, PageID.1658.) Rodriguez held the same position as Carroll, but for the West region. (*Id.* at PageID.1658.) And he too reported to Nowak. (*Id.* at PageID.1641, 1673.) So Rodriguez seems to be similar in many relevant aspects. *See Spratt*, 812 F. App'x at 353 (using the following three factors to determine whether two employees are similarly situated: they "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in substantially identical conduct without differentiating or mitigating circumstances that would distinguish their employer's differential treatment of them").

However, Rodriguez did not "engage[] in substantially identical conduct without differentiating or mitigating circumstances[.]" *See id.* Simply put, Carroll cannot show Rodriguez and him engaged in "substantially identical conduct" because Carroll's performance problems both differed from and exceeded Rodriguez's.

The following chart provides an aerial view of Carroll and Rodriguez's respective performances based on their reviews:

| | Rodriguez 2019 PEFD (ECF No. 44-36.) | Carroll 2019 PEFD (ECF No. 44-16.) | Rodriguez 2020 PEFD (ECF No. 44-37.) |
|---|---|---|---|
| Overall rating | **Fully Effective** | **Needs Improvement** | **Fully Effective** |
| CE Way Maturity | Did not meet | Did not meet | Complete[2] |
| Waste Elimination (EST issues) | Complete | Complete | Complete |
| Exceptional customer service | Complete | Did not meet | Complete[3] (for front line leaders); Did not meet (for contractors) |
| Waste Elimination (p-card) | Complete | On Target | Not Rated (Different evaluation format) |
| Employee Empowerment | On Target | On Target | Not Rated |
| We Earn Our Customers' Business 24/7 | Greatest Strength | Development Area | Not Rated |
| We Cross the Finish Line Together | Not Rated | Not Rated | Not Rated |
| We Put Points on the Board | Development Area | Not Rated | Not Rated |
| We Leave It Better Than We Found It | Development Area | Greatest Strength | |
| It's a Great Place to Work | Greatest Strength | Development Area | Not Rated |
| Following Policies and Procedures | Not Rated | Development Area | Not Rated |

[2] Rodriguez's 2020 PEFD does not list a category called "CE Way Maturity." However, there is a category called "Leader Standard Work," which is described as "[e]nsure all completion of action plans to improve CE Way maturity for your team." (ECF No. 44-37, PageID.2264.) Though it does not include an analysis of whether scores improved, this category seems similar enough to the CE Way maturity category that the Court will treat these as analogous.

[3] In 2020, Consumers apparently broke up the "customer service" category into two: customer experience and on-time delivery. (ECF No. 44-37, PageID.2262–2263.) Both are about meeting customer expectations, but customer experience focuses on partnering with "front line leaders," while on-time delivery focuses on partnering

At the most basic level, the chart shows that in 2019, Rodriguez was rated "fully effective" while Carroll was rated "needs improvement." And Rodriguez received two "greatest strengths" to Carroll's one. True, on a more granular level, both Rodriguez and Carroll "did not meet" the expectation for the "CE Way Maturity" category. But Carroll also "did not meet" the "exceptional customer service" category either and had three development areas compared to Rodriguez's two. And in 2020, Rodriguez "did not meet" expectations for communicating with contractors, which is similar to Carroll's rating in that category for 2019.

The devil is in the details though. And the details show that Rodriguez's performance was not equivalent to Carroll's. Start with CE Way Maturity. While Carroll and Rodriguez received the same rating, Nowak noted that Rodriguez "became the West zone supervisor in October 2019[.]" (ECF No. 44-36, PageID.2251.) Thus, it appears that Rodriguez did not have much time to "work with the team to execute action items to improve by year end" as this category measures. (*Id.*) Carroll argues that this is an example of "Nowak [holding] Plaintiff accountable for existing issues with his team but [giving] Steven Rodriguez slack on his [performance evaluation] for issues she associated" with the group's previous leader. (ECF No. 44, PageID.1318 (citing ECF No. 44-3, PageID.1719 ("[Rodriguez] came into the role in October. So he was basically evaluating the team that had been under Debra's

---

with contractors. *Id.* Thus, the Court will compare Rodriguez's ratings in both categories with Carroll's rating for customer experience.

leadership for—up until her termination.").) But there is no dispute Carroll had been in his role since January 2019, so it was reasonable for Nowak to expect him to improve his team over the year despite preexisting issues. Indeed, he had nine more months to do that than Rodriguez. And still, Nowak rated both Rodriguez and Carroll as "did not meet" in this category.

Further, in 2019, the CE Way category required team leaders to conduct a "self-assessment" of their scores and improve them by the end of the year. Both Rodriguez and Carroll assessed their teams by the end of 2019, with Rodriguez rating his team a 2.4 on average, and Carroll rating his team a 2 on average out of five. (ECF No. 44-16, PageID.2183; ECF No. 44-36, PageID.2251.) Carroll also provided his scores in July and October. (ECF No. 44-16, PageID.2183.) It seems that Nowak determined whether there was improvement based on these scores. (*See id.* (showing Carroll assessed his team on average at a 1.8 in July, a 2.4 in October, and a 2 at year end).) So it is unclear how Nowak's judgment that Carroll did not meet this category is indicative of racial animus when it was based on Carroll's own assessment, which objectively resulted in a lower rating for his team at the end of the year compared to October.

Carroll also argues that Nowak told him to "not focus on CE Way." (ECF No. 44, PageID.1319.) The evidence shows that in June 2019, Nowak stated, "I think I need him to focus on the operation and maybe now is not a great time to have him focusing on process and CE Way. . . . Once they get past Sept. they can breathe and look at how to remove waste and other." (ECF No. 44-11, PageID.2177.)

So it appears that Nowak did not instruct Carroll to stop focusing on CE Way for the whole year—just at the height of the property restoration season during the summer. This argument fails to explain why, come September, Carroll was not able to turn to CE Way and improve those scores or why it was unfair to require him to do so.

Ignoring discrepancies in the details, Carroll argues that though both he and Rodriguez were rated as "did not meet" in the CE Way category, he was rated overall as "needs improvement," while Rodriguez was rated "fully effective" in 2019. But CE Way was Rodriguez's only unmet category; Carroll had another—exceptional customer service. (*See* ECF No. 44-16, PageID.2186.) Exceptional customer service was largely determined using an objective metric: the team's on-time completion rate compared to a particular target. Here, Rodriguez's team scored 82% to Carroll's 77%. (ECF No. 44-16, PageID.2186; ECF No. 44-36, PageID.2253.) In short, their teams were performing differently. True, Rodriguez had only stepped in a few months earlier, so perhaps most of his team's success was due to their previous leader, Hines. But that does not change the fact that Carroll did not meet the target metric for this category, though Nowak noted improvements over the year. And it also does not imply that Rodriguez would have lower scores but for the previous manager. Thus, their exceptional customer service scores help explain why Carroll received an overall rating of "need improvement" and Rodriguez did not.

There were a few other differences that distinguished Carroll and Rodriguez's performance in 2019. Nowak found the "We Earn Our Customer's Business 24/7" category to be a development area for Carroll, stating that there were issues with

resolving customer complaints earlier in the year, but by year end, "he has made improvements to this. Customer complaints and escalations dropped toward the end of season. [Carroll] will need to lead his team in strategies to ensure this continues." (ECF No. 44-16, PageID.2190.) On the other hand, Nowak stated that Rodriguez "works to resolve the issues of [his] customers as quickly and professionally as possible. . . . He ensures that his team follows up on customer issues as well." (ECF No. 44-36, PageID.2256.) In the "It's a Great Place to Work" category, Nowak commented that Carroll had some outstanding training and job-shadowing to complete and that he "needs to be sure he partners with HR quickly to resolve issues with employee performance. There are risks with employee engagement and compliance if he does not align with HR before taking disciplinary actions." (ECF No. 44-16, PageID.2192.) Rodriguez did not struggle in this area—his "team's engagement scores ha[d] already improved immensely since [he] joined the team in October. He ha[d] built up trust with his team and is support[ive] of them." (ECF No. 44-36, PageID.2258.) Rodriguez also completed training requirements in a timely manner. (*Id.*) "Following Policies and Procedures" was another development area for Carroll where Nowak advised him to become more familiar with Consumers' operations by job shadowing and to better manage his calendar so he can be engaged in each meeting. (ECF No. 44-16, PageID.2193.) Rodriguez was not rated in this category at all.

To be sure, this does not mean that Rodriguez did not struggle in his role. He also had a couple of development areas. But the overall picture painted by the 2019

performance reviews shows that Rodriguez and Carroll did not struggle with the same issues, and that Carroll struggled in more areas than Rodriguez at the same time. And where they both had issues, Rodriguez had mitigating factors. So the 2019 reviews do not support using Rodriguez as a comparator to show pretext.

A look at Rodriguez's 2020 review also dispels any notion that Carroll and Rodriguez had comparable performance issues. For one, Rodriguez distinguished himself from Carroll in the CE Way category. Nowak commends Rodriguez on "improving your CE Way maturity this year." (ECF No. 44-37, PageID.2264–2265.) And Rodriguez continued to improve team engagement: "He shows caring and trust of his team and supports them to make them successful. He has shown that he has the team's back and feedback from the team has been positive." (ECF No. 44-37, PageID.2267.)

There is one area that Rodriguez struggled with in 2020 that overlaps with Carroll's issues from 2019—exceptional customer service. Both team leaders struggled with utilizing contractors to meet certain goals. (ECF No. 44-16, PageID.2186; ECF No. 44-37, PageID.2264.) But Nowak stated that Rodriguez's team "[m]et the overall target for property restoration[.]" (ECF No. 44-37, PageID.2264.) The "did not meet" rating was for not meeting the "orders assigned within 24 hours goal." (*Id.*) By comparison, and as noted earlier, Carroll's team finished "just under" the target goal for on-time completion. So it appears that even where Carroll and Rodriguez received the same rating, there were discrepancies in their performance.

Carroll also highlights some other performance deficiencies in Rodriguez's 2020 performance review. These other categories, however, fall under a section entitled "Individual Development Plan," which are goals employees "want to work on for their career or growth within those roles." (ECF No. 40-3, PageID.751.) In other words, the Court does not know whether Consumers considers these objectives in its overall assessment of an employee's performance. And Carroll's 2019 plan includes different objectives under this section than Rodriguez's plan, which makes it difficult to compare. Nevertheless, Carroll argues that Rodriguez is either behind schedule or has not started these individual goals, which is indicative of performance issues.

But a couple of these categories do not seem to reflect current performance. The first one—increase leadership qualities—is marked as a "career growth" category. (*See* ECF No. 44-37, PageID.2267.) Nowak explains, "it wasn't necessarily developing his leadership in his current role, that wasn't an issue. It was developing him as a whole for other career opportunities." (ECF No. 40-3, PageID.751–752.) Similarly, invoicing processes was not an expectation of Rodriguez's role as team leader according to Nowak: "[I]t wasn't something he was doing in his current role, it was something we were doing to go above and beyond for him to take over." (ECF No. 40-3, PageID.752.)

As for the onboarding checklist objective, though it is rated as "not yet started," Rodriguez's comments stated "[w]orked through most of the checklist items though out the year as opportunity became available." (ECF No. 44-37, PageID.2268.) So it is not clear whether Rodriguez started the goal or not. His 2019 performance

25

evaluation, however, did indicate he completed his training on time. (ECF No. 44-36, PageID.2258 ("He completes compliance and training requirements on time and can be trusted to meet deadlines.").)

That leaves Rodriguez's goal of becoming knowledgeable with property restoration to meet the year's objectives. This is rated "behind schedule," perhaps because Rodriguez's team did not meet the "orders assigned within 24 hours" goal. As discussed, this seems to be an area where both Rodriguez and Carroll had issues.

But, as was true when comparing their 2019 performances, Rodriguez completed more objectives in 2020 than Carroll did in 2019. In 2019, Rodriguez struggled with CE Way, but he improved his efforts in that category for 2020. And in 2020, Rodriguez struggled with property restoration goals. The main problem for Carroll, though, is that he struggled with both CE Way and property restoration in 2019. So even though each year Rodriguez and Carroll struggled in a shared category, Rodriguez distinguished himself by performing better in the other categories in a certain year. That could very well explain his better overall performance rating.

And taking a broader view, Carroll's employees criticized his performance to Nowak, while no such issues were noted for Rodriguez, which could explain why Carroll was placed on a performance plan and Rodriguez was not. (*See* ECF No. 40-9; ECF No. 40-13; ECF No. 44-37, PageID.2267 (noting that Rodriguez's "feedback from the team has been positive.").) So the Court finds that Carroll and Rodriguez's respective performances indicate they did not engage in meaningfully similar behavior with differing consequences.

Carroll argues that some of the discrepancies in performance can be attributed to the different training Rodriguez received and the difference in workload. In other words, Carroll's performance issues should be excused because, in comparison to Rodriguez, he had mitigating circumstances. But this seems to be an argument against using Rodriguez as a comparator. *See Spratt*, 812 F. App'x at 353 (explaining that a comparator must have "engaged in substantially identical conduct *without differentiating or mitigating circumstances* that would distinguish their employer's differential treatment of them"). Even so, the record does not support these arguments.

Start with training. Carroll stated that he "received little to no training." (ECF No. 40-2, PageID.482.) He further explained that orientation was "[p]robably one or two days. One-on-one hands-on orientation and . . . maybe another five to seven days of just knowing how to reach out to [Nowak] and giving me the feedback that I needed." (ECF No. 40-2, PageID.460.) He also complained that he was "instructed to a training model from associates that [Nowak] knew had issues with me because they had applied for the position and I got it." (*Id.* at PageID.482.) Nowak does not dispute this. She stated, ""[t]here's not a formal training program or . . . there wasn't a formal training program at the time for new supervisors specifically, but there's, you know the job shadowing, one-on-ones, weekly one-on-ones to run through processes, questions we had about his work. And then I believe there was a new employee, like, onboarding training that came that's company provided." (ECF No. 40-3, PageID.693.)

27

Compare this with Rodriguez's training. Rodriguez stated that, "Nowak provided guidance by meeting weekly . . . and doing 'go sees' and job shadowing. He stated Nowak is available outside of their weekly meetings whenever he had a question or needs support." (ECF No. 44-9, PageID.2170.) Rodriguez also notes that "the job is such that there is no specific training. [I have] learned [I have] to figure out the job and that is how [I] approached [my] work." (*Id.*) Rodriguez also reported that he received support from Nowak when he needed it. (*Id.*)

Carroll, Nowak, and Rodriguez all provided essentially the same description of the training. Both Rodriguez and Carroll stated there was little to no training for the position and most of the training involved learning through experience, including job shadowing their team. And though Carroll argues that Nowak "sat a period of time in Grand Rapids," "worked hands-on in-person for a period" with Rodriguez and was "very open and available and understanding" of Rodriguez when he first started (ECF No. 40-2, PageID.490, 491), he agreed that Nowak was similarly available to him after he started. (*Id.* at PageID.460 ("She was on stand-by for me for any additional information for five to seven days); PageID.466 (describing how he talks to Nowak "[p]retty much every day.").) So the record shows that Rodriguez did not get a meaningfully different training than Carroll.

As far as Carroll's issue that he had to "learn . . . from my direct reports who a lot of them weren't even happy to see me" (ECF No. 40-2, PageID.500), the record shows that Rodriguez was also expected to learn in that same way. Plus, the potential conflict only applied to a couple members of Carroll's team. (ECF No. 40-3,

PageID.690.) So this argument does not explain why Carroll was unable to receive proper training by shadowing other members of his team who had not applied for the same position.

Carroll also points to other instances of "lack of support" from Nowak. He stated Nowak did not help him gain access to certain company systems or fix issues with his email. (ECF No. 40-2, PageID.502 ("[Nowak] assigned me within my first week to request my own accesses to a company system that I was not familiar with. Based on her direction. I put those requests in. I got some type of access, but it wasn't the right access and I had no way or no one to help me get the correct access until it got figured out, which was months down the line. I was getting thousands of emails every single hour to the extent that I couldn't even look at the relevant emails because I was getting thousands of emails every hour. . . . [Nowak] didn't do anything to help me correct it.").) Again, Carroll points to no evidence that Nowak helped others with similar issues. And it is not exactly clear why it took months for the correct access to be granted or that Nowak was the hold-up. Indeed, it is not unusual for new employees to work directly with IT to set up their devices and gain access to the correct systems. So without more evidence that Carroll was treated differently in this way, the Court cannot say that this lack of support from Nowak indicates racial animus or explains why Carroll had performance issues.

Carroll also emphasizes that he had fewer employees for more property restoration work, presumably making it more difficult to perform on par. In 2019, Nowak noted that Carroll's region has "the largest number of [property restoration]

orders and about 45% impact on the workload." (ECF No. 40-8, PageID.944.) Nowak also told Woolford in June 2019 that Carroll did not have a "fully trained team[.]" (ECF No. 44-11, PageID.2177.) And in April 2020, Nowak responded to Carroll stating that he has more work by explaining, "[Richardson] has 4 people full time handling [property restoration] . . . [Rodriguez] has 7 people handling [property restoration], but those same people are still going to field headquarters for mail, 664, tags, p cards, invoices, etc. You currently have 5 people full time plus [part-time help from] Jennifer handling [property restoration]." (ECF No. 44-39, PageID.2271.) So Carroll is correct that he had fewer employees for a larger share of the property restoration work.

But in 2020, Rodriguez's region added two new "headquarters"—Groveland and Howell—and Nowak stated that with that, "there is not much difference between zones[.]" (ECF No. 44-39, PageID.2271; *see also* ECF No. 44-9, PageID.2167 ("The SE zone had around 40% of the overall property restoration [in 2019], but only 5 headquarters and only gas. This year the department leadership shifted property restoration for 2 of the 5 headquarters to the West zone to better balance the workload. In addition, the other zones cover both gas and electric and have many more headquarters to support for time coordination/EST. Rodriguez has 20 headquarters . . . Richardson has 13 headquarters . . . Carroll has 5 headquarters[.]").) So it seems that Consumers and Nowak acknowledged that the 2019 property restoration workload was unbalanced and took steps to correct that in 2020. And though perhaps that would partially explain Carroll's issues with meeting

certain customer-experience metrics, those metrics were percentages. (ECF No. 44-16, PageID.2186 ("The SE zone finished 2019 at 77% on-time completion, just under the 78% target.").) In other words, those rates likely account in part for a disproportionate workload. So Carroll's argument that he had less employees for more work does not adequately rebut Consumers' issues with his performance nor show that Consumers treated Carroll differently because of his race.

One final word on pretext. Carroll argues that Nowak never placed Rodriguez on a performance plan while "all three African American Team Leaders have been placed" on one. (ECF No. 44, PageID.1319.) The record reflects there is nuance to this proposition, however. Nowak stated that though Richardson had a performance plan, "it was completed prior to my being in the position." (ECF No. 44-3, PageID.1650.) In other words, Richardson's performance plan had nothing to do with Nowak, so it does not suggest that Nowak used performance plans as a way to terminate African American employees. And Nowak confirmed she never placed Richardson on a performance plan. (ECF No. 44-3, PageID.1720.)

So Carroll can only factually argue there is an inference of animus from the fact that both Hines and Carroll were placed on performance plans. But this is also not persuasive because Hines is also different from Carroll in key ways.

Before the Court explains, it clarifies that Hines' termination is the subject of a different lawsuit. Nothing in this analysis should be construed as a conclusion on the strength of Hines' claims against Consumers. And this Court also has a limited

record as to Hines, so it does not have the complete picture. In short, this case is about Carroll, and the Court will not litigate Hines' claims within the context of this case.

But suffice to say Hines had worked at Consumers since 1988 and, according to her, Nowak's performance correction plan was "the first significant disciplinary action against" her "in 31 years of employment[.]" (ECF No. 44-7, PageID.2156.) If true, this places Hines in a different position than Carroll from the get-go. And it appears that Hines' performance plan stemmed from a particular incident where an employee of hers complained that Hines "yelled" and "belittled" her. (ECF No. 47-1, PageID.2294, 2305.) Upon investigating, Consumers found that other employees expressed they fear discipline and retaliation from Hines and that she often shames and berates her employees. (*See generally* ECF No. 47-1.) There is also evidence that a contractor that had been working with Consumers for 30 years terminated its contract "due to interactions with [Hines] that have been unprofessional and to the point of threatening." (ECF No. 47-1, PageID.2305.) This is meaningfully different from Carroll's performance issues. True, both performance plans relied on employee feedback, which indicated displeasure with their respective management styles. But Carroll's focused on his lack of familiarity with the company, which led to his alleged abrasiveness and disengagement toward his team, while Hines' was about her professionalism and attitude. So in contrast to Carroll's steady pattern of performance issues, this record—which again, is incomplete—shows that Hines' issues all came to a head at once based on an employee complaint. Thus, evidence of

Hines' treatment does little to show that Carroll was terminated based on his race, and not his performance issues.

*     *     *

In sum, the Court finds that Carroll has not shown that Consumers' reasons for terminating his employment were pretextual. Rodriguez is not a proper comparator, and Carroll's explanations for his performance do not sufficiently rebut Consumers' conclusion that he did not meet its expectations. And Consumers' treatment of Hines is not sufficient to show that Consumers uses performance plans as a pretext to terminate African American employees. So even finding that Carroll was "qualified" for his position such that he makes a prima facie showing of race discrimination, he cannot show that Consumers' performance-based reasons for termination were pretextual. So his race-discrimination claims under Title VII, § 1981, and the ELCRA will be dismissed.

### B. Hostile Work Environment

All three of Carroll's hostile-work-environment claims—under Title VII, § 1981, and the ELCRA—follow the same framework, which requires him to prove that: (1) he was subject to unwelcome harassment, (2) the harassment was based on race, (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment, and (4) Consumers knew (or should have known) of the harassment yet failed to take appropriate action. *See Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (Title VII, ELCRA); *Nicholson v. City of Clarksville, Tenn.*, 530 F. App'x 434, 442 (6th Cir. 2013) (§ 1981).

33

The Court focuses on the second and third factors in its analysis.

### 1. Race-Based Harassment

Before considering whether a reasonable jury could find that Carroll's harassment was race-based, a brief summary of the harassment at issue is in order.

Carroll stated that Nowak harassed him by putting false information in his performance plan; made his "direct reports feel that if they said negative things about [him] or worked against [him] that they would be in a better position in [Nowak's] eyes"; "moved with a conscious eye toward" him; prevented him from certain financial and work opportunities; "talked to [him] in a demeaning, disrespectful way"; did not account for things that were happening in his life or in society that may have impacted him; and did not give him adequate support to lead his team, including by interjecting herself into conversations with his team, not answering his questions, and sometimes taking weeks to respond to emails. (ECF No. 44-2, PageID.1535–1536; ECF No. 44, PageID.1314.)

As none of these actions are "race-specific" or "derogatory terms," Carroll must provide "direct comparative evidence about how the alleged harasser treated members of other races" as compared to African American employees to show this treatment was based on his race. *See Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998)).

Carroll certainly has some evidence that Nowak spoke harshly toward African American employees. *Cf. Khalaf*, 973 F.3d at 485 ("This court has held that a

34

comparison between one member of a protected class and one employee outside of that protected class is not comparative evidence about how the alleged harasser[s] treated *members* of both races in a mixed-race workplace."). Hines confirms Carroll's view on Nowak's treatment and points to evidence that Nowak's treatment of her, Carroll, and Richardson brought Richardson to tears. (ECF No. 44-7, PageID.2156.) So a reasonable jury could find that Nowak used a harsh tone and demeanor against her African American employees.

But that is not sufficient to show a hostile work environment. Carroll must still show that Nowak treated non-African-American employees differently to show his treatment was based on his race. In support of this showing, Carroll first argues that in comparison to Carroll and Hines' description of Nowak's treatment, Rodriguez had a "positive portrayal of Nowak's training, management style, and demeanor[.]" (ECF No. 44, PageID.1315.) But, as this Court already found, Rodriguez and Carroll's descriptions of Nowak's training are by and large the same. As far as management style and demeanor, the only statement the Court has from Rodriguez is that "Nowak is available outside of their weekly meetings whenever he had a question or needs support. . . . Nowak gives him support whenever he needs it." (ECF No. 44-9, PageID.2170.) This hardly amounts to "direct comparative evidence of differential treatment." *See Strickland*, 995 F.3d at 503.

Instead, Carroll offers his general view of Nowak's leadership—that she does not answer his questions and that she does not support him—in comparison to Rodriguez's view. But the disparity in their views does not create an inference that

Nowak's behavior was based on racial animus. *Okojie v. Metro. Nashville Hosp. Auth.*, 584 F. Supp. 3d 543, 557 (M.D. Tenn. 2022), *appeal dismissed*, No. 22-5164, 2022 WL 3754859 (6th Cir. July 28, 2022) ("Plaintiff's subjective belief or perception of whether events were racially charged likewise cannot create a genuine dispute of material fact." (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992))). Indeed, even if Nowak made precisely the same comments to Rodriguez—that he "should know that by now" or "I'm not going to repeat that. We've already went over it once'"— it's possible that he would still feel generally supported while Carroll would not.

A closer look at the examples Carroll provides of Nowak's harassing conduct makes this point even clearer. Carroll argues that in March 2020, he asked Nowak if the company would pay for him to join the American Association of Blacks in Energy and Nowak said no. (ECF No. 44-35.) Nowak forwarded the message to Woolford who replied that he thought Consumers "paid for one professional membership" (*Id.*) Carroll argues that this shows racial animus because, based on Woolford's message, others were given funding to join affinity groups, but he was denied funding to join a similar group for African Americans. But Carroll provides no evidence that the other people Woolford references were only members of other races such that Nowak's denial must have been based on Carroll's race. And Nowak further wrote to Woolford that she denied the request because she thought "with his performance we wouldn't cover it." (*Id.*) So Carroll provides no evidence to allow the Court to infer that this rejection was race-based other than that it involved an affinity group.

36

Carroll also said Nowak would interject herself when he asked an associate for certain information, explaining Nowak "went around me and responded to the email stating that the board did not need to provide me with all of the information that I was asking for[.]" (ECF No. 44-2, PageID.1454.) He also described a situation where he denied an employee's schedule change and Nowak "went ahead and approved what [he] had already denied without talking to [him] about it in advance[.]" (ECF No. 40-2, PageID.584.) But again, nothing about these events leads to the inference that they were based on race. And Carroll provides no evidence that Rodriguez, or another colleague who was not African American, did not receive similar treatment. *See Khalaf,* 973 F.3d 469, 484 (6th Cir. 2020) ("The conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's [protected status].")*; Mensah v. Mich. Dep't of Corr.*, 621 F. App'x 332, 336 (6th Cir. 2015) ("The record suggests the existence of an interpersonal conflict between Mensah and Wolfenbarger, but Mensah has failed to show that Wolfenbarger's behavior was connected to or motivated by national origin and/or racial animus.")*; see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) ("Even if Price harbored some personal dislike of Hawkins that made Hawkins' job more difficult or stressful, an employer is not required to like his employees. And it is for PepsiCo, not the courts, to rule on the wisdom and generosity of Price's management practices." (internal citations omitted)).

As for the delay in response to emails, freezing someone out of the workplace can be evidence of hostile treatment. *Waldo v. Consumers Energy Co.*, 726 F.3d 802,

820 (6th Cir. 2013) ("A reasonable jury could have inferred that this isolation and ostracization was motivated by gender-based animus and thus contributed to the hostile work environment."). But the record only provides one example of this happening (ECF No. 44-13), and Carroll does not specify how often Nowak would delay a response such that the Court can infer it amounted to isolation or ostracization. Further, Carroll also testified that he and Nowak interacted daily. (ECF No. 40-2, PageID.466.) So while perhaps she did not respond to certain emails, no reasonable jury could find that she isolated or ostracized him if they interacted daily. In fact, the record shows that Nowak wanted Carroll to be *more* engaged in the workplace. (*See, e.g.*, ECF No. 44-18, PageID.2204 ("Steven will come to meetings on-time and prepared . . . so he is able to discuss concepts with his team and pause to engage them in conversation.").

As Carroll has failed to provide any "direct comparative evidence" that he was treated differently based on his race, he cannot show that any of his alleged harassment was race based.

## 2. Severe or Pervasive

And even if the Court assumed that Carroll's harassment was based on race, it was not sufficiently severe or pervasive to allow his hostile-work-environment claim to survive.

Courts require a high standard to be met in order to show a hostile work environment. Carroll "must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

38

pervasive to alter the conditions of [his] employment and create an abusive working environment." *Strickland*, 995 F.3d at 505 (internal citations omitted). The work environment must be both subjectively and objectively hostile, the latter meaning that "a reasonable person would have found it hostile or abusive as well." *Id.* Factors in determining whether harassment was severe or pervasive include the frequency of the conduct, its severity, whether it was physically threatening or humiliating, and whether it "unreasonably interfered with the employee's performance." *Id.* at 506.

Despite this demanding standard, Carroll's argument that his harassment was severe or pervasive is one sentence, which states, "a jury could easily [find] Nowak's hostility made the conditions of Plaintiff's job next to impossible to succeed at." (ECF No. 44, PageID.1316.) Apparently, it is up to the Court to fill in the gaps of why that would be. *See Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017) ("A party waives issues that he adverts to in a perfunctory manner, unaccompanied by some effort at developed argumentation.").

Even if the Court were inclined to make that argument for Carroll, it finds that Carroll has not met his burden of showing severe and pervasive conduct. Carroll's examples of harassment paint the picture of—at worst—an overbearing supervisor who disagreed with how her employee managed his team. Carroll complained of Nowak "mov[ing] with a conscious eye toward" him and "not understanding how" his workload and issues with personnel would "have affected the operation or a leader new to the role." (ECF No. 44-2, PageID.1535–1536.) He argues that Nowak put him "in a situation that she knew could lead to negativity in the workplace for myself and

39

my subordinates. She made my direct reports feel that if they said negative things about me or worked against me they would be in a better position in her eyes." (*Id.* at PageID.1535.) But the law does not require supervisors to be understanding or not interfere in their employees' duties. The interference Carroll complains of is well within the duties of a supervisor. (*See* ECF No. 40-2, PageID.584 (describing Nowak reversing a scheduling decision and disagreeing with Carroll's information request from his direct reports).) As for his relationship with his direct reports, Nowak did conduct "skip-level" meetings with them. Carroll stated that some of his direct reports "had told other associates that [Nowak] solicited information from them and that they felt that by sharing that information, that she would look out for them[.]" (ECF No. 40-2, PageID.562.) That is not the same as encouraging employees to say negative things about Carroll. Indeed, Nowak explained that she was careful not to reveal which employees stated certain things in order to protect their confidentiality in the process. (ECF No. 44-3, PageID.1754.) Thus, it appears that Nowak's statement to Carroll's employees was more to encourage honest feedback than to "intimidate[e], ridicule, and insult" Carroll. *See Strickland*, 995 F.3d at 505

In sum, as the Sixth Circuit has concluded, "[w]hile certain criticisms certainly may have been frustrating and discouraging, they were part of the ordinary tribulations of the workplace that do not amount to the sort of extreme conduct required" to show a hostile work environment. *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 337–38 (6th Cir. 2012). So Carroll's claim is dismissed for this reason too.

## C. Disability Discrimination

Carroll also alleges that Consumers terminated him based on his disability in violation of the federal Americans with Disabilities Act and the Michigan Persons with Disabilities Civil Rights Acts. As Michigan law "substantially mirrors the ADA," and both claims "are generally analyzed identically," the Court will analyze both claims in tandem. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (internal citations omitted).

A basic premise of proving termination based on disability is the employer's knowledge of the disability. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016). To make this showing, a plaintiff must show more than the decisionmaker's "general knowledge that a disability exists." *Id.* Rather, the decisionmaker should be aware "of the specifics of an employee's disabilities or restrictions." *Id.* To that end, it is also not sufficient for a plaintiff to show that the employer had knowledge of an employee's symptoms. *Hrdlicka*, 63 F.4th at 567 ("A general awareness of some symptoms is not enough to show that the defendant knew of the plaintiff's disability." (internal citation omitted)). As the Sixth Circuit has explained, "[i]n the typical case, an employer has notice of the employee's disability when the employee tells the employer that he is disabled. Of course, the employee need not use the word 'disabled,' but the employer must know enough information about the employee's condition to conclude that he is disabled." *Cady v. Remington Arms Co.*, 665 F. App'x 413, 417 (6th Cir. 2016). Relevant information can include "a

diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Id.*

Carroll argues that his statements to Nowak along with him seeking approval for leave under the Family Medical Leave Act would allow a reasonable jury to find that Nowak knew he was disabled. Specifically, Carroll testified at his deposition that he "shared with [Nowak] some things that I was going through," including "anxiety[.]" (ECF No. 44-2, PageID.1550.) He said this to Nowak sometime after he started working from home in March 2020 because of the COVID-19 pandemic. (*Id.* at PageID.1551.) He also testified that he "possibly" told Nowak "about the depression that [he] was experiencing." (*Id.* at PageID.1551–1552.) Nowak testified she did not know about Carroll's anxiety or depression. (ECF No. 40-3, PageID.785.)

Taking Carroll's version to be true, as the Court must at summary judgment, a jury could not find that Nowak knew that Carroll was disabled. Carroll's statement to Nowak contained no details about the severity of the anxiety and depression he was experiencing and did not indicate whether he had been diagnosed or treated by a physician for these conditions. And knowing that an employee is experiencing anxiety and depression—especially amid a global pandemic—amounts to "[a] general awareness of some symptoms" and not necessarily awareness of a disability. *See Hrdlicka*, 63 F.4th at 567. Many people may experience anxiety or depression without these conditions "substantially limit[ing] one or more major life activities[.]" *See Equal Emp. Opportunity Comm'n v. West Meade Place, LLP*, 841 F. App'x 962, 966

(6th Cir. 2021). And importantly, neither Nowak nor Consumers were "required to speculate as to the extent of [Carroll's] disability[.]" *See Hrdlicka*, 63 F.4th at 567.

The Sixth Circuit has found notice to be sufficient in cases where the employer had a much more robust sense of the employee's condition. *See Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 738 (6th Cir. 2015) (finding that decisionmaker had reason to know of employee's mental illness where she was aware that his "fiancée believed he need to be hospitalized and that Yarberry had engaged in strange behavior at a store and sent text messages and emails evidencing illogical and irrational thinking; could not carry on a rational conversation; had passed a drug test; and was subsequently placed in a psychiatric hospital"); *Cady*, 665 F. App'x at 418 ("Taken together, a jury could find Cady's complaints about his back, coupled with Remington's knowledge of his surgeries, recent doctor's visit, and MRI results, sufficient to put Remington on notice that he was disabled."). The Court finds that Carroll's barebones description and passing references to Nowak do not meet this standard.

Likewise, courts have routinely rejected the argument that an employer's knowledge of leave amounts to knowledge of a disability. *See, e.g.*, *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) ("Although Tennial's supervisors were aware that he took leave, there is no indication anywhere in the record that his supervisors knew that this leave was for work-related stress."); *Messenheimer v. Coastal Pet Prod., Inc.*, 764 F. App'x 517, 519 (6th Cir. 2019) ("Nor is knowledge that Messenheimer took leave sufficient to show [employer's] awareness of her

43

disability."). The FMLA approval form did not indicate why Carroll was taking leave (ECF No. 44-26), and so in Nowak's eyes, it was possible that Carroll was taking leave to take care of family members and not for himself.

Thus, because Carroll cannot show knowledge, his disability-discrimination claims under the ADA and Michigan's PWDCRA are dismissed.

### D. Retaliation

As is the case with race discrimination and hostile work environment, retaliation claims under Title VII, § 1981, and the ELCRA have similar requirements. *See Khalaf*, 973 F.3d at 488–89. And in cases like this one where there is no direct evidence of retaliatory conduct, courts again apply the familiar *McDonnell Douglas* framework to analyze these claims. *See Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021) (Title VII and ELCRA); *B&S Transp., Inc. v. Bridgestone Ams. Tire Ops., LLC*, 758 F. App'x 503, 505 (6th Cir. 2019) (§ 1981).

To establish a prima facie case of retaliation, Carroll must show that (1) he engaged in protected activity; (2) Nowak knew about the protected activity; (3) an adverse employment action was subsequently taken against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Khalaf*, 973 F.3d at 488–89. If a prima facie case is established, the burden shifts to Consumers to provide a legitimate, nondiscriminatory reason for the adverse action. *Jackson*, 999 F.3d at 344. If that is satisfied, the burden shifts back to Carroll to show the proffered reason was a mere pretext for discrimination. *Id.*

The third factor is undisputed—among other things, Carroll was terminated in August 2020 and received a "needs improvement" rating in January 2020, which impacted his ability to get a raise. The Court addresses the other three factors in turn.

### 1. Protected Activity and Knowledge

Before the Court can address causation—which is where the parties focused—it must determine what protected activity a reasonable jury could find Nowak knew about.

To start, Carroll engaged in three undisputed instances of protected activity: a complaint submitted to a compliance investigator regarding harassment by Nowak on April 13, 2020 (ECF No. 40-16); a meeting with Nowak on June 10, 2020 where Carroll asked Nowak if her issues with him had to do with his race (Audio Ex. 4); and a request to Consumers' Equal Employment Opportunity director to investigate discrimination by Nowak and Williamson on July 6, 2020 (ECF No. 44-27).

But the parties dispute whether Carroll's comments to Woolford about Nowak in May 2019 were also protected activity of which Nowak was aware. Carroll recalls Woolford calling him sometime in May 2019 and stating that "Hines had complained that [Nowak] called her Black. . . . [H]e asked me would I stand for that or did I agree with that [complaint]?" (ECF No. 44-2, PageID.1557.) It appears that the complaint was generally about how Nowak speaks to her African American employees. (*Id.* at PageID.1558.) Carroll testified that he told Woolford that he agreed with Hines' complaint. (*Id.* at PageID.1557.) According to Carroll, Woolford told him that he

would "talk with [Nowak] about it" and "let her know that we had the conversation." (*Id.* at PageID.1558.) And though it is unclear exactly when, at some point after Carroll spoke to Woolford, Nowak told him he "should be careful when [he] was talking to [Woolford]." (ECF No. 44-2, PageID.1509.)

Nowak has a different story. She testified that she was never informed of a complaint that she speaks differently to African American employees compared to white employees. (ECF No. 40-3, PageID.705.) And though she agreed Hines' complaint was brought to her attention after Hines was placed on a performance plan, she was never informed that the complaint was about Hines' race. (*Id.*) Woolford corroborated this account, testifying that Hines did not bring a discrimination complaint to him about Nowak and that he "at no point . . . discussed with [Hines or Carroll] issues of race related to . . . Nowak[.]" (ECF No. 40-4, PageID.859–860.) According to Woolford, he asked Carroll about "[Nowak's] communication style," "her leadership," and "how does she interact[ed] with the team[.]" (*Id.* at PageID.865.) He also stated he "let [Nowak] know that [he] had had discussions with the team once they were completed," but that was "[m]ore of an overview or a general outcome." (*Id.*)

Hines' affidavit confirmed that she complained to Tiffany Alexander, an HR employee, and Doug Detterman, Woolford's boss, about the way Nowak "spoke to myself and the other African American employees." (ECF No. 44-7, PageID.2156.) But as to Woolford specifically, she stated she emailed him saying she "believed Nowak was setting [her] up to fail." (*Id.*) Hines' written April 2019 complaint to Woolford about her performance plan does not mention race. (ECF No. 47-2.)

Given Carroll's view of the conversation and Nowak's subsequent warning to be "careful," there appears to be a fact issue as to whether the May 2019 conversation involved allegations or a discussion of discrimination. *See Khalaf*, 973 F.3d at 489 ("For a plaintiff to demonstrate a qualifying 'protected activity,' he must show that he took an 'overt stand against suspected illegal discriminatory action.'" (quoting in part *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012))). Likewise, there appears to be a fact dispute as to whether Nowak knew about the details of the May 2019 conversation between Carroll and Woolford and whether Nowak's "be careful" comment pertained to that conversation. *See Khalaf*, 973 F.3d at 490–91 ("Retaliation requires proof that the individuals charged with taking the adverse employment action knew of the [plaintiff's] protected activity[.]" (internal citations omitted)). So those two elements of Carroll's prima facie case are satisfied at summary judgment, and the Court concludes that a reasonable jury could find that Carroll's May 2019 comments were protected activity and that Nowak knew about those comments.

To sum up, the Court finds that these activities satisfy the protected conduct prong:

- Carroll's May 2019 comments to Woolford

- Carroll's April 13, 2020 complaint to a compliance investigator

- Carroll's June 10, 2020 complaint to Nowak

- Carroll's July 6, 2020 complaint to Consumer's EEO director

So the Court will consider causation as to all four.

47

## 2. Causation

Title VII requires but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). The causation standard under the ELCRA is a bit unclear but having not been provided anything to the contrary from the parties, the Court finds that to prevail under the ELCRA, Carroll must meet the but-for standard. *See Beard v. AAA of Michigan*, 593 F. App'x 447, 452 (6th Cir. 2014) (reasoning that Michigan courts would interpret ELCRA to require but-for causation).

The Court starts with temporal proximity. With respect to the adverse actions, recall that Carroll received a "needs improvement" rating, which impacted his ability to get a raise, in January 2020 and that the decision to terminate Carroll was made by August 5, 2020.

At least two protected activities were temporally close to Carroll's termination. His July 6, 2020 investigation request occurred about one month before the decision to terminate him. (*See* ECF No. 44-27 (email from Kosnik indicating Carroll complained of systemic racism and hostile work environment); ECF No. 40-14 (email from Williamson discussing Carroll's termination).) One month proximity between these two events satisfies Carroll's burden at the prima facie stage. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (collecting cases where two or three months' proximity satisfied prima facie burden); *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (finding that in cases where temporal proximity alone is sufficient, "the adverse employment action is often taken just days or weeks from when the employer learns of the employee's protected

48

activity"). Similarly, Carroll's June 10, 2020 conversation with Nowak occurred just under a couple of months before he was terminated, so it also satisfies the temporal proximity standard. But these activities occurred after Carroll's performance evaluation, so they cannot be the cause of his poor rating.

The April 13, 2020 complaint presents a closer call than the other two. It occurred almost four months before Carroll was terminated and after he received his performance review. And more recently, the Sixth Circuit has found that temporal proximity of only a "few weeks" to be sufficient on its own to satisfy causation at the prima facie stage. *See George*, 966 F.3d at 460. Temporal proximity of almost four months seems like a stretch. But because the prima facie burden is not onerous, the Court will assume without deciding that causation is satisfied here too. *See Jackson*, 999 F.3d at 349 ("At the prima facie stage, this burden is not onerous[.]").

However, Carroll's evidence is weak as to the temporal proximity between the May 2019 conversation and the adverse actions of receiving a "needs improvement" on his performance review in January 2020 and being terminated in August 2020. True, Nowak emailed Woolford on October 30, 2019, saying she intends to rate Carroll as needs improvement. (ECF No. 40-4, PageID.884.) Assuming that amounts to an adverse action, it was still five months after the conversation in May 2019. So temporal proximity alone does not satisfy Carroll's prima facie burden as to the May 2019 conversation. *George*, 966 F.3d at 460.

But Carroll is not out of luck just yet. "[A]n employee can still prevail if [he] couples temporal proximity with other evidence of retaliatory conduct to establish

49

causality." *George*, 966 F.3d at 460. Indeed, "temporal proximity coupled with evidence of heightened scrutiny may be enough to satisfy a Title VII plaintiff's burden on causation at the *prima facie* stage." *Kenney v. Aspen Technologies, Inc.*, 965 F.3d 443, 449 (6th Cir. 2020). To make this showing, Carroll argues that after he told Woolford he agreed with Hines' race-based complaint, "it seemed like Nowak and Woolford sought to get rid of him" and his "performance was unreasonably scrutinized moving forward." (ECF No. 44, PageID.1323.) Carroll contends that after he spoke to Woolford in May 2019, "there was a direct change or increase in the hostility, direct and targeting the situation where, you know, company documents, the processes were used to make lies about me, diminish my character. [Nowak] was talking to her associates who were upset because they didn't get the position. She was getting feedback about me. She did not filter any of that information or consider the source before she put it into the company documents[.]" (ECF No. 44-2, PageID.1531.)

But the record reveals a few issues with this argument. For one, Carroll's claims of unfair, heightened scrutiny are not supported by the record. The Sixth Circuit recognizes retaliation claims based on heightened scrutiny, but clarifies that, "[g]enerally speaking, heightened scrutiny is reflected by a similar three-step pattern: an employee engages in conduct that, while technically objectionable, is blessed, or at least tolerated, by the employer; the employee engages in protected activity; the employer then takes an adverse action against the employee for conduct the employer had previously allowed." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020). But Nowak apparently was tracking Carroll's performance from the

day he started, according to her coaching document. (ECF No. 40-6.) That document revealed performance issues from before May 2019, such as a February 27 incident where Carroll had given directives to a manager when he was the one who should have completed the task, a March 13 incident where Nowak noted Carroll had not set up a certain process that "was supposed to be in place 1 month ago," and a March 29 incident where Nowak stated she asked Carroll to set up job shadows again as "he still has not done so." (ECF No. 40-6, PageID.932.) And before she issued the documented counseling on November 1, Nowak said she had been giving Carroll performance feedback through coaching from when he started. (ECF No. 44-3, PageID.1729–1730.) Nothing about these coaching notes indicates that these issues— which are similar to issues down the road—were tolerated or condoned by Consumers before May 2019.

Second, the record shows that Nowak's alleged increase in hostility or lack of support of Carroll was not a one-way trajectory after May 2019. On June 27, 2019, Nowak privately told Woolford that she was "worried" about Carroll. She elaborated, "I think he has a good work ethic and he has the intelligence. I'm worried because the pace in his area is so fast and he's so new. I think I need him to focus on the operation and maybe now is not a great time to have him focus on process and CE way. I think I need to help him with that more." (ECF No. 44-11.) This certainly does not reflect the "aggressive" attitude or lack of understanding toward Carroll after May 2019. (ECF No. 44-2, PageID.1494 ("A lot of these other attacks that came much more aggressive, visible and forceful after I . . . assisted with the investigation about Debra

Hines[.]").) And it also does not indicate that Nowak was attempting to walk Carroll out the door.

Third, Carroll takes issue with Nowak's use of skip-level meetings. He stated that these processes were used to "make lies about me, diminish my character." (ECF No. 44-2, PageID.1531.) But the record does not contain any evidence that these skip-level meetings were retaliatory. It appears that Nowak conducted such meetings with the direct reports of Rodriguez and Richardson, too. (ECF No. 44-3, PageID.1792.) And the first skip-level meeting conducted by Nowak appears to have been in February 2020, which was at least more than nine months after the May 2019 conversation. The feedback from September 2019 was a result of Carroll's employees coming to Nowak, not the other way around. True, Carroll is correct that many of the employees' complaints are not "filtered" in the document Nowak compiled of the meetings. But Carroll does not explain why these comments must be filtered. As discussed before, only two of Carroll's team applied for the same job he did, which is the only reason Carroll identifies for filtering the complaints. But in February 2020, Nowak met with eight team members (ECF No. 40-9), and in June, she met with 13 individuals who work with Carroll (ECF No. 40-13). So no reasonable jury could determine that the feedback is false or view the skip-level meetings as evidence of retaliatory behavior or hostility following the May 2019 conversation.

The other examples of Nowak's deteriorating attitude toward Carroll after May 2019 are not adequately tied to retaliation either. For example, Carroll stated that he would sometimes reach out for "support or clarification of an overall picture" when

creating meeting notes he was required to make per company policy. Nowak would tell him he "wasn't following the meeting . . . or paying attention properly" and treated it as a disciplinary issue. (ECF No. 44-2, PageID.1494.) He also mentioned that Nowak "went around" him and contradicted his request for information from an employee before asking him. (*Id.* at PageID.1454 ("[S]he stepped in, told the associate that they didn't need to provide the information, and at that time, my request was valid and needed.").) Carroll testified about another time where he denied a schedule change for an employee and Nowak reversed that decision and "made it seem like it was a disciplinary conversation . . . and at that time, she didn't take into account any of the facts around why I denied it." (ECF No. 44-2, PageID.1559.) And according to Carroll, there were "many instances" where his questions were met by Nowak saying, "You should know that by now" or "I'm not going to repeat that. We've already went over it once." (*Id.* at PageID.1436.)

The main issue for Carroll though is that none of these behaviors are per se retaliatory. In fact, it would not be abnormal for any supervisor to engage in like conduct regardless of whether an employee engaged in protected activity. And while perhaps some of these methods are not commendable ways to manage, the Court is not in the business of making those judgments. Instead, it has to determine whether a jury could rely on this behavior to find that but-for Carroll's May 2019 conversation with Woolford, he would not have suffered adverse action.

And on this record, Nowak's conduct in coaching Carroll cannot be described as heightened scrutiny and would not allow a jury to infer that the termination or

poor performance review was retaliatory. *Cotton v. Williamson Cnty. Gov't*, — F. Supp. 3d—, No. 3:21-CV-00712, 2023 WL 186864, at *20 (M.D. Tenn. Jan. 13, 2023) ("A counseling memo that had no adverse effect on the terms of his employment and that was objectively warranted by the circumstances does not amount to heightened scrutiny or evidence of retaliation."). Rather, it appears that these coachings were the natural consequences of workplace events. For example, the information issue was perhaps Nowak's way of responding to employee complaints that Carroll "doesn't communicate clearly the reasons why they are being asked to do things." (*See* ECF No. 40-9, PageID.956.) As to the schedule change, there is some evidence that Nowak did that because the employee complained to Nowak that Carroll denied her request for an appointment to prepare for surgery. (ECF No. 40-6, PageID.933.) It is not clear if this is the same scheduling decision Carroll is referring to though. Regardless, Carroll has not shown that Nowak's way of managing him after May 2019 amounts to heightened scrutiny as it is within the realm of what a supervisor would typically do and not meaningfully different from how Nowak managed him before the protected activity. And the only evidence that Nowak treated Carroll differently in this way is Carroll's own perception that he never saw Nowak act this way toward Rodriguez. But Carroll agrees that he has no way of knowing what else took place between Nowak and Rodriguez at meetings or situations he was not involved in. (*See generally* ECF No. 44-2, PageID.492–494.)

Further, the Court is not persuaded that there are no intervening causes between the May 2019 conversation and the adverse actions. Namely, the complaints

Nowak was receiving from Carroll's employees. The Sixth Circuit has "held that an intervening cause between protected activity and an adverse employment action dispels any inference of causation." *See, e.g.*, *Kenney*, 965 F.3d at 450.

Here, Nowak received problematic feedback from Carroll's employees three separate times. First, in September 2019, one of Carroll's direct reports contacted Nowak and "said the team wanted to meet with [her] to discuss concerns regarding the dept." (ECF No. 40-6, PageID.933.) But before Nowak met with them, the team attempted to meet with Carroll first. (*Id.*) Carroll initially did not respond, and ultimately, told the employee she was being "disrespectful," that she should cancel the meeting, and discuss any issues with him one-on-one. (*Id.*) Once Nowak learned of the situation, she encouraged Carroll to "act on it" as it was a "great opportunity to receive feedback[.]" (*Id.*) Carroll complied and, with Nowak in attendance, met with the team and received feedback, which included requests that he answer email in a timely manner, indicate whether a conversation is a "coaching" or a discussion about process, be less directive with "stakeholders," and become more familiar with the business. (*Id.*)

Then, in February 2020, Nowak arranged to have a "skip-level" meeting with Carroll's employees. She learned that his employees felt as if he did not listen to them, did not communicate clearly, did not answer certain questions about the business, and wasted time with too many meetings. (ECF No. 40-9.) And finally, Nowak conducted another round of skip-level meetings in June. While there was some positive feedback, (*Id.* at PageID.1104 ("Appreciates his thoroughness and attention

55

to detail"); *id.* ("More open to feedback now"); *id.* at PageID.1105 (No issues. Things seem to have settled down.")), many of the same issues recurred (*id.* at PageID.1104 ("He isn't abusive per se, but he still snaps at people when he realizes he is wrong or doesn't understand what they are asking."); *id.* ("[S]he said she prefers to just avoid him."); *id.* ("Not really any difference. The [daily meeting] is still too long."); *id.* at PageID.1105 ("Seeing progress but [Carroll] is still not retaining everything he hears."); *id.* ("[Carroll] is still mixing up who is responsible for what team or area."); *id.* ("He is abusive and demeaning and then picks right back up where he left off[.] . . . [H]e is abrasive and gets upset about getting off his itinerary for the meeting."); *id.* at PageID.1106 ("[Carroll] is rude and disrespectful and feels retaliation when they mention things to him and he won't be open to feedback. I asked what she meant by retaliation and she indicated he just gets angry.")). Out of the 13 people interviewed, about half mentioned an issue with their team leader Carroll. (*See generally* ECF No. 40-13.)

The September 2019 complaints are an intervening cause between the May 2019 conversation and the October 2019 performance decision. And all three instances are intervening causes that dispel any inference of causation between the conversation with Woolford and Carroll's termination. In other words, any one of these feedback sessions could constitute a legitimate reason for Consumers to terminate Carroll, and all occurred closer in time to the adverse actions. This makes it unlikely that Carroll's May 2019 conversation with Woolford was the but-for cause of the October 30, 2019 decision to rate him as "needs improvement" or his August

2020 termination. *See Kenney*, 965 F.3d at 450 ("[T]he record here reflects at least two intervening causes: the complaints filed against Kenney and the documented instances of Aspen employees leaving due to her management style. Either one would qualify as an intervening cause justifying Kenney's termination."). Importantly, in response to this feedback, Carroll only argues that Nowak should have considered the source of the feedback and filtered it accordingly. But the only reason Carroll provides for why his employees might provide inaccurate or unfair negative feedback is because some of them applied for his position. Again, the record shows that reasoning only applies to two employees (ECF No. 40-3, PageID.690), while the negative feedback is coming from more than two. So there is little, if any, reason for a jury to believe that the employees' feedback was biased or inaccurately reflected the situation.

So the Court finds that Carroll has not met his prima facie burden of showing that but-for the May 2019 conversation with Woolford, he would not have suffered any adverse actions.

### 3. Non-Discriminatory Reason and Pretext

As for the other three protected activities that are closer in time to Carroll's termination, Carroll's retaliation claim fails because he cannot show pretext.

As discussed previously, Consumers has provided a nondiscriminatory reason for terminating Carroll—his failure to correct his performance issues. Notably, before Carroll first complained to Consumers' compliance department on April 13, he had

already received a documented counseling, a "needs improvement" on his performance evaluation, and a performance correction plan.

Now Carroll must show that these reasons provided by Consumers were pretextual. *See Jackson*, 999 F.3d at 350. "At its core, pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.*

Carroll again raises Nowak's treatment of Rodriguez, who has not engaged in protected activity, as evidence that Nowak's true motive was retaliatory. (ECF No. 44, PageID.1326.) The Court reaches the same conclusion it did earlier: Rodriguez is not a proper comparator, and his treatment does not lead to the inference that Carroll was retaliated against.

Similarly, Carroll also raises the fact that Hines was also terminated after she complained about Nowak's treatment. (*See* ECF No. 44, PageID.1325 (arguing causation is "only strengthened by the existence of another African American comparator who was fired after 31 years of employment following complaints of discrimination and harassment relating to Nowak").) Again, this Court is not making any findings as to whether there is sufficient evidence for a jury to find that Nowak retaliated against Hines. But this argument fails to persuade as to Carroll's claim. Hines does not say when she complained to HR and Detterman about Nowak's disparate treatment of African American employees. So it is not clear whether the February 12, 2019 complaint about Hines and the resulting investigation—which, on March 27, concluded in a recommendation to place Hines on a performance plan— occurred before her complaints or were an intervening cause for her placement on a

plan. And Hines was terminated on August 2, 2019, which was over three months after she emailed Woolford stating that she believed Nowak was setting her up to fail. (*See* ECF No. 44-7, PageID.2156–2157.) So there is little evidence on this limited record for a jury to infer that Nowak exhibited retaliatory behaviors toward her employees.

Carroll also argues that performance issues did not actually motivate his termination because until he told Nowak she was targeting him based on his race in June 2020, he was receiving positive feedback on his performance plan. (ECF No. 44, PageID.1323.) Carroll states that Nowak and Williamson told him that he was "on track" during a previous performance plan meeting. But after June 10, where Carroll stated, "I don't know if it is a racial thing [Williamson] has with me, or it's a racial thing you have with me, [but] I have noticed that there has been a history of new team leaders from the outside that they are thrown into a situation without support," (Audio Ex. 4), he only received negative reviews, which were used to justify his termination.

A closer look at the recorded conversations rebuts this argument. It is true that on May 20, 2020, Nowak stated that "things seem to be on track at this point." (Audio Ex. 2.) But that came after she and Carroll discussed other issues, including taking opportunities to reach out to employees one-on-one, taking customer calls during other meetings, and cutting down meeting times. (*Id.*) So while Carroll was certainly taking steps toward addressing Nowak's concerns, there were still outstanding

59

issues. And the recorded conversation by no means indicates that Carroll has completed his performance plan.

Similarly, Nowak ends the June 2 call by saying she's "seeing improvement" and she appreciates Carroll's efforts. (Audio Ex. 3.) She also commends Carroll on addressing contractor issues. (*Id.*) The rest of the call, however, involved a discussion of unresolved issues, including encouraging Carroll to further investigate employee concerns and determine whether certain concerns are generally held or particular to an individual, whether Carroll is following along at meetings and communicating information to his team, and whether his team understands expectations. (*Id.*) Once again, it is not a completely negative portrayal of Carroll's performance. But the conversation also does not show that Carroll no longer had issues with the objectives noted on the performance plan or that he was done working on his performance plan.

In all, and construing the recordings as whole, the Court finds that they do not show a shift in Nowak's treatment of Carroll after he told her that he believes the issues are race-based. The Court agrees that there is more back-and-forth in the subsequent conversations and less agreement between Nowak and Carroll. That change is based on both parties' behavior in the conversation, though, and not Nowak alone. And at bottom, Nowak still provided Carroll with examples of things he should improve, which is similar to the feedback she gave in prior meetings. So the Court finds that the recordings are not evidence that Consumers' reasons are pretext for retaliatory motives.

Carroll also generally states that "[b]ased on the voluminous evidence provided herein and Defendants' many contradictions and inconsistencies," a reasonable jury could find Consumers' reasons to be pretextual. (ECF No. 44, PageID.1327.) Yet the Court does not find there are any contradictions or inconsistencies. By contrast, the record shows a consistent pattern of performance issues and no evidence showing that these issues either did not exist or were not really issues. Even if some of these issues were overblown or nitpicked by Nowak, Carroll cannot dispute that his own employees reported issues with him on three separate occasions. This feedback recounted recurring problems and came from multiple employees, not just one or two. And similar performance issues were documented from the beginning of Carroll's employment and well predated the April 2020 complaint, the June 2020 conversation with Nowak, and the July 2020 investigation.

In sum, no reasonable jury could find that Consumers' proffered reasons for termination were pretextual. The Title VII, § 1981, and ELCRA retaliation claims are dismissed.

### E. FMLA Retaliation[4]

The Court focuses on pretext for Carroll's FMLA retaliation claim, which also uses the *McDonnell Douglas* burden-shifting framework.

---

[4] Carroll's second amended complaint listed this claim as "Violation of the Family Medical Leave Act—Interference," but the substantive allegations state "Defendants retaliated against Plaintiff in violation of the FMLA leave by terminating him in response to him requesting to utilize and/or utilizing protected leave[.]" (ECF No. 23, PageID.203.) To the extent Carroll was seeking to also bring a claim for FMLA interference, such a claim has been abandoned because he did not argue it in his response brief. *See Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003).

Though the parties dispute whether Carroll can meet his prima facie burden on causation, the Court finds that the timeline satisfies Carroll's "minimal" burden at the prima facie stage. (*See* ECF No. 44-2, PageID.1548 ("I was fired while I was on intermittent leave. My official termination date was August 12 and I believe I was on intermittent leave at the time.")); *see also Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 529 (6th Cir. 2020) ("We agree with the district court that the temporal proximity between Robinson taking FMLA leave from October 10–25, 2016, and the termination of his employment on November 15, 2016, satisfies the low threshold for a prima facie case of retaliation.").

But temporal proximity is not enough to show pretext. *See Robinson*, 821 F. App'x at 530. As the Court has analyzed pretext many times in this opinion, it will not redo that work here.

Carroll does raise a few additional arguments as to why Consumers' performance-based reasons were pretext for retaliation for taking FMLA leave. Carroll stated that when he returned from intermittent leave, Nowak "put extra pressure" on him by saying, "you were off, so I had to do X, Y, and Z." (ECF No. 44-2, PageID.1546.) She also attempted to discipline him for "an open order that came through the day I was off, and the day I got back, I didn't see the email until the end of the day and she was not understanding or helpful at all . . . for what I felt was something caused by, you know, a slight delay with me being out of work for that day." (*Id.*) Carroll also points out that Nowak told the HR department that she had "concerns" about Hines' "FMLA use of time for headaches, etc." (ECF No. 44-38.)

In light of the evidence in support of Consumers' reasons for terminating Carroll, the Court finds this evidence insufficient to show pretext. "Although a supervisor's statements concerning an employee's age, disability, or requested FMLA leave can be probative of discriminatory or retaliatory intent, 'isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding' of unlawful discrimination." *Robinson*, 821 F. App'x at 531 (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993)). The examples Carroll provides of Nowak's hostility toward his leave are ambiguous. Nowak detailing the tasks she completed for him while he was off does not necessarily mean she was upset about Carroll's leave. Nowak could very well just be informing Carroll of what happened while he was gone so he did not redo any work and was aware of how things stood. Likewise, the disciplinary action is not clear either, as Carroll says he did not see the email until the end of the next day when he was back. So it is not clear if Nowak was upset about Carroll's delay in response because he was on leave or upset that he did not address the email first thing when he was back from leave instead of waiting until the end of the day.

Regardless, even if these comments are indicative of Nowak's disapproval of Carroll's leave, the totality of the evidence does not show that retaliation for FMLA leave was a factor in his termination. Nowak was notified that Carroll was approved to take FMLA leave on June 23, 2020. (*See* ECF No. 44-26; ECF No. 40-3, PageID.785.) So Nowak was notified of this leave after she had rated Carroll as "needs improvement" on his performance review (ECF No. 44-16), issued a performance

correction plan to Carroll (ECF No. 40-11), and heard complaints from Carroll's employees three separate times (ECF Nos. 40-6, 40-9, 40-13). The bulk of Carroll's performance issues had already occurred by the time Nowak was notified that he was taking FMLA leave. And by that point, the period Carroll was given to complete his performance plan was almost over (ECF No. 40-11, PageID.1080 (review period from March 23 to June 30, 2020)), so Nowak would have a good sense of whether Carroll was going to complete the plan or not. And as discussed, Carroll does not adequately rebut the existence of his performance issues or whether they were enough to terminate him.

Given these issues, a reasonable jury could not conclude that Carroll was terminated in retaliation for taking FMLA leave. That claim is also dismissed.

## IV.

In conclusion, Consumers' motion for summary judgment (ECF No. 40) is GRANTED. A separate judgment will follow.

SO ORDERED.

Dated: May 11, 2023

s/Laurie J. Michelson<br>
LAURIE J. MICHELSON<br>
UNITED STATES DISTRICT JUDGE